# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION

A. E., J. O., O. E., J. K. and D. R.,

        Plaintiffs,

v.                                       Case No:   6:20-cv-2153-GAP-RMN

BREVARD COUNTY SCHOOL
BOARD and STACEY GARZIONE,

        Defendants

_____

## ORDER

This cause comes before the Court on five Motions for Summary Judgment against Plaintiffs A.E. (Doc. 97), D.R. (Doc. 121), J.K. (Doc. 122), J.O. (Doc. 123), and O.E. (Doc. 124) filed by Defendants Brevard County School Board ("BCSB" or "School Board") and Stacey Garzione, their teacher. The parties fully briefed the first of those motions concerning A.E. (Docs. 106, 115) but Plaintiffs' counsel did not timely respond to the remaining four.[1]  With one motion fully briefed and the others without a response, the matter is ripe. For the reasons discussed below, the Court

---

[1] Less than eight hours before the already once-extended response deadline, Plaintiffs' counsel alerted Defendants and the Court for the first time that they had not received certain attached exhibits filed under seal, and requested another extension. (Docs 130-133). The Court denied the request. (Doc. 136). Plaintiffs filed untimely responses anyway (Docs. 138-144) and asked the Court to reconsider (Doc. 145), which the Court struck and denied (Doc. 149).

will grant summary judgment in favor of BCBS and Ms. Garzione with respect to Counts I-IV, and dismiss Counts V-VIII without prejudice.

## I.    Background

This matter arises from reported abuses that occurred during the 2018-2019 school year in Ms. Garzione's special education classroom at Ralph Williams Elementary School ("Ralph Williams") in Rockledge, Florida. (Docs. 1, 97, 121-124). According to a substitute teacher and a former instructional aide, Ms. Garzione would discipline the six developmentally disabled students in her first-grade class by squeezing their hands and pinching beneath their armpits, sometimes escalating to forcible restraints that the two found troubling. (Docs. 91-9; Doc. 91-10, pp. 2, 5; Doc. 91-11). She would also taunt and antagonize the students in a mean-spirited way, the two said, like using her personal cellphone to record them misbehaving and then threatening to send those videos to their parents. (Doc. 91-9, pp. 6, 27, 40).

Prior to entering Ms. Garzione's class that year, school officials evaluated each of the plaintiffs—A.E., D.R., J.K., J.O., and O.E.—for developmental disabilities and arranged Individualized Education Plans ("IEP") dictating the guidelines, goals, and accommodations necessary for their learning. (Docs. 96-1, 96-2, 116-7, 117-4, 118-3, 118-11, 119-3). All of them have difficulty with verbal communication skills. (*Id.*) Four have received autism spectrum disorder diagnoses. (Docs. 96-1, 117-4, 118-11, 119-3). Of the children, O.E. presented perhaps the most profound

behavioral issues, his IEP noting that he will "cry, hit, bite, scratch, and yell" when frustrated. (Doc. 119-3, p. 4). Ms. Garzione said O.E. would have violent outbursts about three times a month—scratching or headbutting teachers and classmates during "rage phase[s]," as well as hitting himself. (Doc. 120-4, ¶¶ 7-8, 13-14).

The School Board first approved the hire of Ms. Garzione to teach special education at Ralph Williams for the 2017-2018 school year. (Docs. 90-1, 90-2). During Ms. Garzione's first year at the school, Wesley Herold (who would become principal the next year) evaluated her teaching as proficient and received no complaints regarding her conduct. (Doc. 90-24; Doc. 92-1, pp. 28-29).

School administrators became aware of Ms. Garzione's alleged abuses at the end of January 2019 when a substitute teacher, Maren Caldwell, reported it to Principal Herold following a two-and-a-half-week assignment in the special education classroom. (Doc. 91-1; Doc. 92-2; Doc. 91-9, p. 8; Doc. 92-1, pp. 26-27). A statement with similar allegations from Janice Tessari, an instructional aide formerly assigned to Ms. Garzione, followed soon after. (Doc. 91-9, p. 9).[2] Principal Herold immediately forwarded Ms. Caldwell's allegations to the Florida

---

[2] Ms. Tessari said she confronted Ms. Garzione in October 2018 about "cruel and unorthodox discipline" she observed, but she did not relay those concerns to anyone else at the time. (Doc. 91-9, pp. 21-22). According to Ms. Tessari, Ms. Garzione did not appreciate the questions about her methods and had Ms. Tessari transferred out of the classroom two weeks later. (*Id.*) Ms. Tessari did not report her concerns to anyone higher up at the time, she said, because the administration "thought [Ms. Garzione] walked on water" and would not believe her. (Doc. 115-2, p. 13; *see also* Doc. 91-15, p. 12).

Department of Children and Families ("DCF")—which opened a child safety investigation concurrently with a Brevard County Sheriff's Office ("BCSO") criminal one. (Docs. 91-7, 91-10, 91-11).[3] The School Board tasked a BCSO internal affairs officer, Agent Joe Martin, to follow up with an internal investigation afterward. (Doc. 91-9).

Both Ms. Caldwell and Ms. Tessari described Ms. Garzione to investigators as unnecessarily rough and harsh with her students. (Doc. 91-9, pp. 5-6, 23-24). Ms. Garzione said that she squeezed students' hands and pinched their armpits because "it doesn't leave a mark," according to Ms. Tessari. (Doc. 91-10, p. 5). Ms. Tessari said Ms. Garzione would intentionally step on the hands and feet of students who were not paying attention or sitting correctly. (Doc. 91-9, p. 22; Doc. 91-10, p. 5). She also recalled seeing Ms. Garzione pin D.R. between two desks after he threw a pencil. (Doc. 91-9, p. 23).

Ms. Garzione's treatment of O.E., according to Ms. Tessari and Ms. Caldwell, was the most troubling. Both women told investigators they observed Ms. Garzione place O.E. into a mat and then kneel on it for about a minute when he had meltdowns, each worried that he could not breath while she did so. (*Id.* at pp. 5-6,

---

[3] School officials did not immediately remove Ms. Garzione from the classroom once the investigations commenced, against DCF's wishes. (Doc. 91-10, p. 3). A DCF supervisor had to reach out to a School Board employee by email to explain that Ms. Garzione should not have access to the children during the pendency of the investigation. (*Id.*)

23-24).[4] Ms. Caldwell said she witnessed Ms. Garzione restrain O.E. and shove her fingers into his mouth to fish out illicitly obtained M&Ms he had started eating from a bag she had left on the floor near him. (Doc. 115-1, p. 23). Ms. Garzione would also spray pencils with a disinfectant and wipe them down with hand sanitizer to deter O.E. from eating the erasers, Ms. Caldwell said. (Doc. 91-9, pp. 4, 6).[5]

Investigators uncovered some corroboration for what Ms. Caldwell and Ms. Tessari claimed. One of the students said that Ms. Garzione will pinch him under his arms, motioning toward his armpits, and "it hurts." (Doc. 91-10, p. 3; Doc. 91-11, p. 3). Several parents described their children coming home with swollen fingers and a fear of returning to class that the children could not explain. (Doc. 91-11, p. 3). Another instructional aid assigned to the classroom, Jodi Herring, told investigators that she too witnessed Ms. Garzione compress O.E. in the mat and at other times heard students say, "Ouch, you hurt me." (Doc. 91-9, p. 21). Against school policy, Ms. Garzione had covered the window on her classroom door with construction paper. (Doc. 91-9, p. 34). Ms. Garzione admitted to squeezing students' hands and using a mat to perform "compression therapy."[6]   (Doc. 91-11, p. 3).

---

[4] O.E.'s IEP states "deep compression using a mat and sometimes a weighted vest also helps [him] regulate his body." (Doc. 119-3, p. 4).

[5] Ms. Garzione admitted coating pencils with disinfectant products but claimed she did so to stop the spread of illness in her classroom. (Doc. 91-9, p. 29, 40). She denied all of the other allegations except for using the mat and squeezing students' hands. (Docs. 93-1, 121-1-120-6).

[6] The School Board recognizes compression therapy—during which a child is enclosed in

None of the investigations uncovered physical evidence of abuse or resulted in criminal charges. (Doc. 91-10, p. 10; Doc. 91-11, pp. 3-4). Noting BCSB policy does not condone squeezing students' hands, pinching beneath their arms, or using a mat for compression therapy, DCF investigators determined "there are unsafe practices in place in the classroom that are cause for concern" — recommending that Ms. Garzione be retrained on BCSB policies involving special needs students and if she cannot properly implement them, that she cease teaching students unable to verbalize what goes on inside the classroom. (Doc. 91-11, p. 3-4). DCF also observed that "there appears to be no one stopping the teacher or if anyone speaks up the teacher becomes aggravated and intimidates the help in her room." (*Id.* at 3). BCSO investigators deemed witness statements regarding Ms. Garzione's "concerning" behavior "credible" but ultimately concluded with the state attorney's office that the criminal elements for child abuse had not been met. (Doc. 91-10, p. 10).

Having a more exculpatory tone, the BCSB internal investigation concluded any abuse allegations were "unfounded" and that Ms. Garzione had violated no laws, yet faulted Ms. Caldwell, Ms. Tessari, and Ms. Herring for failing to report child abuse sooner. (Doc. 91-9, pp. 35-37). The Florida Department of Education also

---

a weighted object — as a method for soothing an autistic child. (Doc. 92-1, p. 16). But BCSB policy only authorizes compression therapy using a weighted vest or blanket, not a mat. (Doc. 91-11, p. 3)

did not see fit to take any action against Ms. Garzione, who maintains a valid teaching certificate. (Doc. 91-14). The School Board chastised Ms. Garzione for recording students on her personal phone and coating classroom writing utensils with disinfectants—pointing out the risk to child safety if students then put the pencils in their mouths—and required that she submit to some retraining. (*Id.* at 40).

Relieved by the results of the BCSB investigation, Principal Herold called Ms. Garzione to tell her that he decided to put her back in the classroom. (Doc. 92-1, pp. 32-33). He held a faculty meeting where he announced that Ms. Garzione was "cleared" and "returning to work," which drew a mixed response, with some staff applauding and one teacher threatening to resign. (*Id.* at 34-35). He then held a meeting with the students' parents, flanked by Agent Martin and other school staff, to inform them of his decision to let Ms. Garzione continue teaching their children, which "didn't go well." (*Id.* at 33).

Parents for five of the six students filed this lawsuit on their children's behalf alleging Defendants violated state and federal law. (Doc. 1). Counts I and II allege BCSB violated Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. §§ 706, and Title II of the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12131, by imposing Ms. Garzione's "reign of trauma" upon her students and then turning a blind eye to it. (*Id.* at ¶¶ 78, 83-103). Counts III and IV allege Defendants violated 42 U.S.C. § 1983 by depriving the students of their substantive right to be free from

excessive force under the Fourteenth Amendment's Due Process Clause. (*Id.* at ¶¶ 104-115). Counts V-VIII allege various state law tort and statutory claims. (*Id.* at ¶¶ 116-141).

## II.   Legal Standard

A party is entitled to summary judgment when it can show that there is no genuine issue as to any material fact. FED. R. CIV. P. 56(c); *Beal v. Paramount Pictures Corp.*, 20 F.3d 454, 458 (11th Cir. 1994). Which facts are material depends on the substantive law applicable to the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The moving party bears the burden of showing that no genuine issue of material fact exists. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991); *Watson v. Adecco Employment Servs., Inc.*, 252 F.Supp.2d 1347, 1351–52 (M.D. Fla. 2003). In determining whether the moving party has satisfied its burden, the court considers all inferences drawn from the underlying facts in a light most favorable to the party opposing the motion, and resolves all reasonable doubts against the moving party. *Anderson*, 477 U.S. at 255.

When a party moving for summary judgment points out an absence of evidence on a dispositive issue for which the non-moving party bears the burden of proof at trial, the nonmoving party must "go beyond the pleadings and by [its] own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Celotex*

*Corp.*, 477 U.S. at 324–25 (internal quotations and citations omitted). Thereafter, summary judgment is mandated against the non-moving party who fails to make a showing sufficient to establish a genuine issue of fact for trial. *Id.* at 322, 324–25; *Watson*, 252 F.Supp.2d at 1352. The party opposing a motion for summary judgment must rely on more than conclusory statements or allegations unsupported by facts. *Evers v. Gen. Motors Corp.*, 770 F.2d 984, 986 (11th Cir. 1985) ("conclusory allegations without specific supporting facts have no probative value") (citations omitted); *Broadway v. City of Montgomery, Ala.*, 530 F.2d 657, 660 (5th Cir. 1976).

Where "the adverse party does not respond, summary judgment, *if appropriate*, shall be entered against the adverse party." FED. R. CIV. P. 56(e) (emphasis added). Even when unopposed, a district court must consider "the merits of the motion" and review "all of the evidentiary materials submitted in support of" it to "determine if there is, indeed, no genuine issue of material fact." *United States v. One Piece of Real Prop. Located at 5800 SW 74th Ave., Miami, Fla.*, 363 F.3d 1099, 1101-1103 n.6 (11th Cir. 2004). But "[t]he district court need not *sua sponte* review all of the evidentiary materials on file at the time the motion is granted." *Id.*

## III.   Analysis

The dispositive issues in this case are (1) whether the School Board intentionally discriminated against the students on the basis of their disabilities, and (2) whether Ms. Garzione's behavior was sufficiently egregious to support a cause

of action under § 1983. *J.S., III by & through J.S. Jr. v. Houston Cnty. Bd. of Educ.*, 877 F.3d 979, 985 (11th Cir. 2017); *T.W. ex rel. Wilson v. Sch. Bd. of Seminole Cnty., Fla.*, 610 F.3d 588, 601-605 (11th Cir. 2010). For the reasons stated below, the Court answers in the negative on both.

### A.    Section 504 and ADA claims

Title II of the ADA and § 504 of the Rehabilitation Act forbid discrimination on the basis of disability in the provision of public services. Title II of the ADA states "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. Likewise, § 504 provides that "[n]o otherwise qualified individual with a disability in the United States, . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794.

"Discrimination claims under the ADA and the Rehabilitation Act are governed by the same standards, and the two claims are generally discussed together." *J.S., III*, 877 F.3d at 985 (citing *Cash v. Smith*, 231 F.3d 1301, 1305 (11th Cir. 2000)). To state a claim under Title II and § 504, a plaintiff must demonstrate "'(1) that he is a qualified individual with a disability; (2) that he was either excluded

from participation in or denied the benefits of a public entity's services, programs, or activities, or was otherwise discriminated against by the public entity; and (3) that the exclusion, denial of benefit, or discrimination was by reason of the plaintiff's disability.'" *Id.*

Plaintiffs seek compensatory damages as relief for their § 504 and Title II claims—premised, at least in part, on the denial of a free and appropriate education ("FAPE"). (Doc. 1, ¶¶ 89, 100; Doc. 106, p. 17). For claims involving the denial of a FAPE, the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. §§ 1400, compels the exhaustion of available administrative remedies before a plaintiff files a lawsuit seeking "relief" that is "available" under the IDEA by way of another federal statute. *Fry v. Napoleon Cmty. Sch.*, 580 U.S. 154, 168 (2017) (quoting 20 U.S.C. §1415(*l*)). Defendants asked the Court to dismiss the § 504 and Title II claims since Plaintiffs have not sought any administrative remedies. (Doc. 97, pp. 12-13). But students need not exhaust administrative procedures under the IDEA before seeking relief in the form of compensatory damages under the ADA or other statutes. *Luna Perez v. Sturgis Pub. Sch.*, 143 S.Ct. 859, 865 (2023) (noting the IDEA does not make compensatory damages available). Plaintiffs' § 504 and Title II claims can therefore proceed. *Id.*

To obtain damages for a violation of the ADA, a plaintiff must prove that "the entity that he has sued engaged in intentional discrimination, which requires a

showing of deliberate indifference." *Silberman v. Miami Dade Transit*, 927 F.3d 1123, 1134 (11th Cir. 2019). Under that standard, "a plaintiff must show that the defendant knew that harm to a federally protected right was substantially likely and failed to act on that likelihood." *McCullum v. Orlando Reg'l Healthcare Sys., Inc.*, 768 F.3d 1135, 1147 (11th Cir. 2014) (quotation marks and emphasis omitted). With an organization like a school board, that requires proving an official "high enough up the chain-of-command" to address the harm, like the principal, had "actual knowledge" of it and failed to adequately respond. *J.S., III*, 877 F.3d at 987 (citations omitted).

Blind or not, nothing in the record could reasonably have turned the School Board's eye to Ms. Garzione's unauthorized practices until Ms. Caldwell complained. *See T.W. ex rel. Wilson*, 610 F.3d at 604 (holding a school board that investigated repeated complaints of abuse that it could not substantiate did not act with deliberate indifference). The attachments are devoid of any communication, documented incident, or complaint from which the School Board could have been "made aware" of Ms. Garzione's unauthorized practices before then, as Plaintiffs' baldly contend. (*See* Doc. 106, p. 17). Principal Herold testified that no one complained about Ms. Garzione prior to Ms. Caldwell. (Doc. 92-1, pp. 25-26). The record establishes that he took immediate steps to have authorities—including the School Board—investigate Ms. Caldwell's complaint upon receiving it. (Doc. 91-1;

Doc. 91-7; Doc. 91-15, p. 12; Doc. 92-1, pp. 26-27; Doc. 92-2; Doc. 115-2, p. 13).[7]  Those investigations uncovered some concerning practices not authorized by BCSB policy, which the School Board addressed by ordering Ms. Garzione to undergo retraining. (Doc. 91-9, p. 40; Doc. 91-11, p. 3). Therefore, no reasonable jury could conclude that the School Board intentionally discriminated against Plaintiffs on the basis of their disabilities.

Ms. Garzione's unauthorized practices, troubling as they may be, cannot lead a reasonable jury to find she acted solely by reason of her students' disabilities, either. *See T.W. ex rel. Wilson*, 610 F.3d at 604-605 (indicating that a teacher restraining a student in response to disruptive behavior was not motivated solely by reason of plaintiff's disability). Viewed in the light most favorable to Plaintiffs, Ms. Garzione squeezed her students' hands, pinched their armpits, stepped on their hands and feet, and sometimes physically restrained them to the point of causing pain. But as in *T.W.*, the record shows that Ms. Garzione acted as she did only in response to misbehavior. Ms. Tessari described the armpit-pinching as a "method of physical discipline" and a way to get the students to stand up. (Doc. 91-9, p. 22). Ms. Garzione said she squeezed students' hands to redirect them mid-meltdown.

---

[7] Even though the School Board did not immediately remove Ms. Garzione from the classroom once the DCF and BCSO investigations commenced, (Doc. 91-10, p. 3), Plaintiffs do not contend—nor is there evidence to support—that any of Ms. Garzione's abusive behavior occurred after those investigations began.

(Doc. 91-10, pp. 9-10). Ms. Tessari offered the same reason. (Doc. 115-2, p. 7). Even regarding Ms. Garzione stepping on students' hands and feet, Ms. Tessari said that happened when the students "were not paying attention or sitting right." (Doc. 91-9, p. 22). Plaintiffs provide no evidence that Ms. Garzione engaged in any of this behavior solely by reason of the students' disabilities.

### B.    Section 1983

The Due Process Clause protects individuals against arbitrary exercises of government power, but "only the most egregious official conduct can be said to be 'arbitrary in the constitutional sense.'" *County of Sacramento v. Lewis,* 523 U.S. 833, 845–46 (1998) (quoting *Collins v. City of Harker Heights,* 503 U.S. 115, 129 (1992)). To be arbitrary in the constitutional sense, an executive abuse of power must "shock[ ] the conscience." *Id.* at 846. "[T]he constitutional concept of conscience shocking duplicates no traditional category of common-law fault, but rather points clearly away from liability, or clearly toward it, only at the ends of the tort law's spectrum of culpability." *Id.* at 848. The Due Process Clause does not "impos[e] liability whenever someone cloaked with state authority causes harm." *Id.* "[C]onduct intended to injure in some way unjustifiable by any government interest is the sort of official action most likely to rise to the conscience-shocking level." *Id.* at 849.

Both the Eleventh Circuit and the Supreme Court have "said repeatedly that the Fourteenth Amendment is not a 'font of tort law' that can be used,

through section 1983, to convert state tort claims into federal causes of action." *Neal ex rel. Neal v. Fulton County Bd. of Educ.,* 229 F.3d 1069, 1074 (11th Cir. 2000); *see also Lewis,* 523 U.S. at 848. Nevertheless, "excessive corporal punishment, at least where not administered in conformity with a valid school policy authorizing corporal punishment . . . may be actionable under the Due Process Clause when it is tantamount to arbitrary, egregious, and conscience-shocking behavior." *Neal,* 229 F.3d at 1075; *T.W. ex rel. Wilson,* 610 F.3d at 598. To determine whether a particular instance of corporal punishment is "conscience-shocking," a plaintiff must establish that, "(1) a school official intentionally used an amount of force that was obviously excessive under the circumstances, and (2) the force used presented a reasonably foreseeable risk of serious bodily injury." *Neal,* 229 F.3d at 1075. In determining whether the amount of force used is obviously excessive, a court must consider the totality of the circumstances, "[i]n particular, (1) the need for the application of corporal punishment, (2) the relationship between the need and amount of punishment administered, and (3) the extent of the injury inflicted." *Id.* Plaintiffs' disabilities also weigh in the balance. *T.W. ex rel. Wilson,* 610 F.3d at 600; *see also J.V. v. Seminole County Sch. Bd.,* No. 6:04–cv–1889–ORL–28JGG, 2007 WL 7261470 at *9 (M.D. Fla. March 21, 2007) (". . . because J.V. is developmentally disabled, the degree of injury required to constitute a constitutional deprivation is less and the use of unnecessary and excessive force is particularly malicious.")).

Considering the first *Neal* factor, there was at least some need for discipline before Ms. Garzione used force against the students as described in the record. Each witness statement describing Ms. Garzione's general use of force—the hand-squeezing, the armpit-pinching, the stepping on extremities, and the use of the mat as a physical restraint—came paired with an explanation that disruptive or disobedient behavior prompted it. (*See* Doc. 91-9, p. 22-23; Doc. 115-2, p. 7). Even for the specific incidents, O.E. had gotten up from his desk without permission and started eating M&Ms out of Ms. Garzione's bag before she restrained him and fished the ill-begotten candy out of his mouth, according to Ms. Caldwell. (Doc. 115-1, p. 23). D.R. had thrown a pencil at Ms. Garzione before Ms. Tessari saw her pin him between two desks. (Doc. 91-9, p. 23). In all of the above instances, Ms. Garzione's actions are "capable of being construed as [] attempt[s] to restore order, maintain discipline, or protect [the students] from self-injurious behavior." *T.W. ex rel. Wilson,* 610 F.3d at 600.

With regard to the second factor, balancing of the need for punishment and the amount of punishment administered suggests that, at most, Ms. Garzione's behavior was inappropriate, but not "conscience-shocking." *See S.S. v. Princeton House Charter Sch., Inc.*, 909 F. Supp. 2d 1348, 1353 (M.D. Fla. 2012). As this Court has previously observed, severe disability can "increase the need for physical intervention, particularly when the child does not respond to verbal instructions."

*Id.* Even though BCSB policy does not condone using a mat for compression therapy, every witness to the practice said O.E. was mid-meltdown whenever Ms. Garzione placed him in it, which his IEP condoned to calm him down. (Doc. 91-9; Doc. 119-3, p. 4). The DCF report establishes that the hand-squeezing and armpit-pinching were inappropriate—but the amount of force accompanying a pinch or squeeze that leaves no bruising or serious swelling, even when "it hurt[s]," is not so far afield of the need to punish disruptive behavior or maintain order as to shock the conscience. (*See* Doc. 91-11). Viewed in the light most favorable to Plaintiffs, Ms. Garzione may have used more physical force than necessary or when alternative disciplinary methods would have sufficed. But "'the amount of force at issue here was [not] totally unrelated'" to the need for the use of force. *T.W. ex rel. Wilson*, 610 F.3d at 601 (quoting *Peterson v. Baker*, 504 F.3d 1331, 1336 (11th Cir. 2007)).

With respect to the final *Neal* factor, the record evidence of physical injury in this case is paltry—indicating only pain from pinching and swollen fingers. (Doc. 91-11, pp. 3-4). Compare that with the injury from a nearly six-foot, 300-pound teacher twisting an autistic student's arms, pinning him to the ground, and bending his thumb back on multiple occasions. *Id.* at 608 (Barkett, J., dissenting). In that case, the teacher constantly abused and verbally berated her students as well. *Id.* Despite the severity of the teacher's behavior, the Eleventh Circuit affirmed summary judgment for the defendant. *Id.* at 602. In yet another case, the Eleventh Circuit

found that a teacher "forceful[ly] feeding and ripping excess skin off [a student's] lips," as well as "forcing [the student's] thumb down her throat in an effort to stop her from sucking her thumb," did not shock the conscience. *Hatfield v. O'Neill*, 534 Fed. App'x 838, 845 (11th Cir. 2013).

Plaintiffs rely heavily on the extent of the students' disabilities in the one response their counsel bothered to timely file. (Doc. 106, p. 20). Further, only A.E.'s psychological injury is before the Court, in the form of treatment notes from counseling initiated about ten months after Ms. Caldwell's complaint. (Doc. 104-2). A.E.'s medical records indicate that his behavior regressed and he developed post-traumatic stress disorder during his time in Ms. Garzione's class. *Id.* Since beginning class with Ms. Garzione, A.E. started having outbursts and tantrums and would refuse to go to school. *Id.* at 2. The counselor documented that A.E.'s mother observed him acting out the alleged abuse with figures and, when upset, yelling, "Don't act like Mrs. G!" (*Id.* at 1).

But as troubling as psychological injuries can be, "courts rarely find a psychological injury sufficient to meet § 1983's high threshold." *S.S.*, 909 F. Supp. 2d at 1334-35. As noted by the Eleventh Circuit in *T.W. ex rel. Wilson*,

> [w]e are mindful that students like T.W., who suffer from severe developmental disabilities, are particularly vulnerable to psychological harm, and that psychological injuries can be as traumatic, if not more traumatic, than physical injuries. It is clear that "[p]laintiffs have not fared well where psychological damage forms either the sole

> basis of or is an element of the plaintiff's substantive due process claim," *Dockery v. Barnett*, 167 F.Supp.2d 597, 603 (S.D.N.Y.2001), but we can imagine a case where an exercise of corporal punishment—even one that causes only psychological injury—"might be so severe that it would amount to torture equal to or greater than the stomach pumping abuse condemned in *Rochin*," *Abeyta ex rel. Martinez v. Chama Valley Indep. Sch. Dist.*, 77 F.3d 1253, 1258 (10th Cir.1996); *see also Rochin v. California*, 342 U.S. 165, 72 S.Ct. 205, 96 L.Ed. 183 (1952).

610 F.3d at 601-02. The court then affirmed summary judgment for the defendant even though, viewed in the light most favorable to the plaintiff, the teacher "aggravated [the student's] developmental disability, exacerbated his behavioral problems, and caused symptoms of post-traumatic stress disorder." *Id.*

Here, the physical injuries suffered by the students are minor and the psychological injury sustained by A.E. is, at most, equal to that of the plaintiff in *T.W.* To belabor a common refrain, none of this should suggest that the use of force against vulnerable students is acceptable. *See T.W. ex rel. Wilson*, 610 F.3d. at 602 ("We do not condone the use of force against a vulnerable student on several occasions over a period of months[.]"); *S.S.*, 909 F. Supp. 2d at 1355. But in light of the above cases, no reasonable jury could conclude that Ms. Garzione's use of force was obviously excessive in the constitutional sense. Because the use of force was not obviously excessive, it is not necessary to consider whether the force used presented a reasonably foreseeable risk of serious bodily injury. *Peterson*, 504 F.3d at 1338 n. 6.

**C.     State law claims**

Having disposed of Plaintiffs' federal claims, the Court declines to exercise supplemental jurisdiction over the state law claims. *See* 28 U.S.C. § 1367(c)(3) (district court may decline to exercise supplemental jurisdiction when claims giving rise to original jurisdiction have been dismissed). Accordingly, Plaintiffs' state law claims (Counts V-VIII) will be dismissed without prejudice. *See T.W. ex rel. Wilson v. Sch. Bd. of Seminole County, Fla.*, 6:07–CV–155–ORL–28GJK, 2009 WL 1140101 (M.D. Fla. Apr. 28, 2009) *aff'd*, 610 F.3d 588 (11th Cir. 2010).

**IV.     Conclusion**

In light of the foregoing, it is hereby **ORDERED** as follows:

1.  Defendants' Motions for Summary Judgment on Counts I-IV (Docs. 97, 121-124) are **GRANTED**;

2.  Counts V-VIII are **DISMISSED WITHOUT PREJUDICE**;

3.  All pending motions are **DENIED as moot**;

4.  The Clerk is directed to enter judgment in favor of Defendants on Counts I-IV and to, thereafter, close the file.

**DONE** and **ORDERED** in Chambers, Orlando, Florida on July 11, 2023.



GREGORY A. PRESNELL
UNITED STATES DISTRICT JUDGE

Copies furnished to:

Counsel of Record